OPINION OF THE COURT
David B. Saxe, J.
The issue that I am asked to decide, raised by defendants’ *156 challenge to this taxpayer action, is whether a site designated, condemned, and reconstructed pursuant to an urban renewal program retains its status as urban renewal property after the completion of construction under the original urban renewal plan.
In this taxpayer action under General Municipal Law § 51, it is alleged that the sale of the Coliseum site at Columbus Circle (the site) constituted a waste of taxpayers’ funds because competitive bidding was not used. The complaint requests a permanent injunction stopping the sale of the site, as well as the city’s planned contribution of its share of the sale proceeds to the defendant Metropolitan Transit Authority (MTA) and the proposed payment to the New York City Transit Authority (NYCTA) of the difference between the highest bid received and that of the bid accepted from Boston Properties. If the sale has already taken place, the complaint alternatively seeks rescission and a declaration that the transfer is void and a waste of funds. The defendants request an order pursuant to CPLR 3212 granting them summary judgment dismissing the complaint as a matter of law. This is a renewal of the motion which was denied by this court in November 1987 with leave to renew after two related proceedings were consolidated with this action.
The site was acquired by the city in 1953 under the Columbus Circle Slum Clearance Plan, pursuant to then prevailing General Municipal Law § 72-k, and use and occupancy was conveyed to the Triborough Bridge and Tunnel Authority (TBTA) for construction of the Coliseum in consideration of approximately $2 million paid by the TBTA. Construction of the Coliseum was completed in 1956.
The construction of the Jacob Javits Convention Center in the early 1980’s led the city and the TBTA to realize that the Coliseum would become obsolete, and its eventual sale was contemplated. In February 1985 the TBTA, for itself and on the city’s behalf, issued a request for proposals (RFP) for the purchase and development of the site. Fifteen proposals were received, and that of Boston Properties was ultimately chosen. Although Boston Properties’ proposal was approximately $22 million lower than the highest purchase price offered, the city determined that the difference would be recouped as a result of the revenue generated by the Boston Properties’ proposal. However, because the NYCTA would stand to lose the cash difference in the immediate sale prices, the city agreed to pay *157 the difference between the proposals to the NYCTA out of the city’s capital budget, for capital transit improvements.
Subject to obtaining the necessary environmental and zoning approvals, the TBTA, for itself and on behalf of the city, entered into a purchase and sale agreement with Boston Properties in September 1985.
In 1986 the city’s Department of Housing Preservation and Development developed a second amendment to the 1952 urban renewal plan which, referring to the Coliseum site, proposed construction of a new structure on the site, "to prevent deterioration of the area and to provide for redevelopment of the Site, after termination of the Coliseum use, in accordance with the City’s current objectives. The Revised Project retains the office building, the parking garage and portions of the Coliseum structure and integrates them into a mixed-use development consisting of a new office complex a retail center, a hotel and apartments.” This proposal was approved by the City Planning Commission in 1986, and by the City Board of Estimate in February 1987. The proposed sale to Boston Properties was approved by resolution of the Board of Estimate and by the TBTA in February 1987.
In two separate proceedings in the Supreme Court, other aspects of the sale to Boston Properties were challenged. The court there held illegal a provision of the contract which in essence provided for payment to the city of an additional $57 million if the developer succeeded in obtaining City Planning Commission approval for a maximum floor area bonus in exchange for subway improvements. That provision, and resolutions by the city and the TBTA approving the contract, were held to be void (see, Matter of Municipal Art Socy. v City of New York, 137 Misc 2d 832 [NY County 1987]). That decision does not render moot the issue of law framed by this summary judgment motion, namely, whether the RFP process was appropriately employed here as a lawful alternative to competitive bidding. I will address that question in this decision.
Certain issues raised by defendants must be addressed at the outset. First, as plaintiff concedes, General Municipal Law § 51 applies only to defendants Koch and the City of New York, and does not permit taxpayer actions against the TBTA or MTA (see, Matter of New York Post Corp. v Moses, 10 NY2d 199, 203-204). However, the remaining defendants are necessary parties, since they might be inequitably affected by a judgment, and they are therefore properly joined here (see, CPLR 1001 [a]).
*158 Secondly, in order to determine which statutes control the sale of the site, it is necessary to clarify the nature of ownership of the site. The city retains legal title to the site and a reversionary interest in it while the TBTA has the right to use and occupy it for the duration of its corporate existence (see, Public Authorities Law § 553 [4]; § 557-a [2]). Although the TBTA is empowered by statute with authority to sell, on behalf of the city, real property which was acquired by the city at the "expense” of the Authority (see, Public Authorities Law § 553 [4-a] [b]), it is apparent that the city has retained some ownership interest in the property. This is evident by the fact that the city is contractually one of the sellers, expects to receive a substantial portion of the proceeds, and has retained substantial control over the entire sale process. To some extent the sale appears to be by the city, and to that extent it must be governed by the New York City Charter.
New York City Charter § 384 provides that sale of any interest in real property held by the city must be for the highest marketable price, at public auction or by sealed bids, "[e]xcept as otherwise specifically provided by law” (NY City Charter § 384 [b]). The defendants rely upon General Municipal Law § 507 (2) for such an exception. It provides that under certain circumstances the sale of a municipality’s real property may be otherwise than by public auction or sealed bids; one such circumstance is where the property is being sold to a "qualified and eligible sponsor”, "for the effectuation of any of the purposes of the urban renewal program in accordance with the urban renewal plan” where specific detailed procedures are followed (see, General Municipal Law § 507 [2] [d]).
Plaintiff contends that this exception to the prohibition in New York City Charter § 384 against selling municipal real property other than to the highest bidder is inapplicable to this sale arguing that since the Urban Renewal Law (General Municipal Law § 500 et seq. [eff Apr. 11, 1961]) was enacted after the Coliseum project was completed, its provisions, including the exception at issue, have no application to the site; plaintiff asserts that the sale is governed by former General Municipal Law § 72-k, which lacks such a specific exception. Essentially, plaintiff claims that the status of the Coliseum as part of an urban renewal program ended with the completion of construction. I held otherwise.
The Coliseum site was initially properly designated as urban renewal property under an urban renewal plan in 1952: a redevelopment plan was submitted to the City Planning Com *159 mission (CPC); the CPC held a hearing and then approved the plan, which the Board of Estimate then reviewed and approved. The determination by those bodies that the site was appropriate for urban renewal was upheld in Kaskel v Impellitteri (306 NY 73, 78), in which the court held that "Power to make that determination has been lodged by the Constitution (N. Y. Const., XVIII, § 1) and the statute (General Municipal Law, § 72-k) in the city planning commission and the board of estimate, and when those bodies have made their finding, not corruptly or irrationally or baselessly, there is nothing for the courts to do about it.”
It is undisputed that construction pursuant to the urban renewal plan was completed in 1956; the substandard and blighted conditions found in 1953 were apparently remedied, and indeed the record contains no indication that the city found any need to further improve, repair, or take action with respect to the site for at least two decades following completion of construction. However, the defendants claim the underlying urban renewal program was slated to remain in effect for 40 years after construction of the project was complete; they look to a provision of the original redevelopment plan, stating that "No increase in density or change in land use shall be made for a period of 40 years except upon the approval of the Board of Estimate of the City of New York.” This provision was adopted in the 1953 resolution of the Board of Estimate, and when use and occupancy of the property was conveyed by the city to the TBTA, section 506 of that contract provided that any further conveyance by the TBTA within the 40-year period must include a covenant running with the land requiring Board of Estimate approval for any changes in land use or density; a further provision required uses of the property to be limited to those specified in the redevelopment plan, "as said plan may exist from time to time.” Aside from this 40-year limitation on use of the property, no other provision of the redevelopment plan addresses whether the plan was contemplated to survive completion of the project’s construction.
Plaintiff minimizes the importance of this "forty year provision”, and points out that its inclusion was standard for all redevelopment projects under the Federal Housing Act of 1949. However, this provision severely limits the use of the urban renewal site because once the original blight has been remedied, the city through this prohibition on changes in land use retains the authority and obligation to assure that the property, once improved, is protected for a 40-year period *160 against misuse. Under this provision, the owners are prevented from selling the property in an arm’s length commercial transaction to a commercial bidder. I conclude that although physical construction of the Coliseum urban renewal site was incontrovertibly complete in 1956, the underlying urban renewal plan remains in effect until the plan’s use limitations no longer apply.
Since the urban renewal plan or program did not end upon the completion of construction, the revised Urban Renewal Law (General Municipal Law § 500 et seq.) may be applied to it (see, General Municipal Law § 523), and the exception to competitive bidding set forth in section 507 (2) (d) is applicable: this sale clearly effectuates the purpose of the urban renewal program in accordance with the urban renewal plan, and the means used has been held to be a lawful alternative to competitive bidding, where not prohibited (see, Matter of Citiwide News v New York City Tr. Auth., 62 NY2d 464).
All facts underlying the proposed sale of the property are agreed upon, and no issue of fact prevents a determination as a matter of law. Thus, the first cause of action, claiming that the city acted illegally by failing to use competitive bidding in the selection of a buyer for the site, may not be maintained.
The second and third causes of action are also deficient. They claim, respectively, that the splitting of the proceeds of the sale between the city and the MTA, and the city’s payment of the difference between the highest bid and that of Boston Properties to the MTA are unlawful gifts, which constitute waste of taxpayers’ funds. The city is prohibited from giving gifts to private corporations (NY Const, art VIII, § 1). However, the NYCTA and the TBTA are public benefit corporations, which are classified as public corporations under General Construction Law § 65 (b). Therefore as a matter of law, the second cause of action fails. The third cause of action also fails as a matter of law, since the city is empowered to pay capital costs for transit facilities under Public Authorities Law § 1203, and the $22 million the city agreed to pay the NYCTA was to come from the city’s capital budget.
To defeat a motion for summary judgment, plaintiff must present evidentiary facts sufficient to raise a triable issue of fact; conclusory statements of fact or law are insufficient (see, Mallad Constr. Corp. v County Fed. Sav. & Loan Assn., 32 NY2d 285, 290 [1973]). Therefore, that part of the affirmation of plaintiff’s attorney alluding to a "new scaled-down pro *161 posai,” without admissible evidence to support such conclusory assertions, is of no probative value and was therefore disregarded by this court (see, Capelin Assocs. v Globe Mfg. Corp., 34 NY2d 338, 342 [1974]).
Defendant’s motion for summary judgment is granted, and the complaint is dismissed in its entirety. The parties to the two proceedings previously ordered to be consolidated for joint trial are directed to proceed to trial expeditiously.