OPINION OF THE COURT
Rosalyn Richter, J.
In this CPLR article 78 proceeding, petitioners, who consist of a community environmental group and individual community members, seek to enjoin further construction of the AOL-Time Warner development project located at Columbus Circle (the project). This project, when completed, will provide the headquarters and studios for AOL-Time Warner, three separate performance venues for jazz at Lincoln Center, retail shops and restaurants, residential apartments and a hotel. Petitioners seek an order halting construction until one of the respondents herein examines the environmental impact of alleged changes in the project’s size that petitioners claim were made in violation of size restrictions imposed as a result of a 1997 environmental review. In the alternative, petitioners seek an order requiring the project developer to downsize the project so that it falls within the size limitations reflected in the 1997 study. Petitioners also contend that additional environmental reviews are mandated by imminent, but not yet enacted, changes in federal law concerning carbon monoxide standards for the New York City area. In addition to requesting a stay of construction, petitioners also seek to stay, modify or annul building and construction permits which have been previously approved and issued for the project.
Respondents in this action are the developer of the project, Columbus Centre, L. L. C., (Columbus), Mayor Rudolph Giuliani, the City of New York (the City) and the New York City Department of Buildings (Buildings Department) (collectively the City respondents), and the Metropolitan Transportation Authority (MTA) and its affiliate, the Triborough Bridge and Tunnel Authority (TBTA) (collectively the Authority respondents).[1] Each of the respondents has moved to dismiss the petition on multiple grounds. Additionally, the City respondents have moved for summary judgment. For the reasons discussed herein, the Authority respondents’ motion to *361 dismiss is granted in whole, the City respondents’ and Columbus’ motions to dismiss are granted in part, denied in part and held in abeyance in part pending a factual hearing, and the City respondents’ motion for summary judgment is held in abeyance.
The background for this litigation stems back to 1952 when, pursuant to the Columbus Circle Redevelopment Plan, New York City acquired the area bounded by West 58th Street, West 60th Street, Ninth Avenue and Columbus Circle.[2] A year later, the City conveyed the property to the TBTA. After the sale, the TBTA constructed the New York Coliseum on the site and operated it as a convention center. In 1985, the City and the TBTA closed the Coliseum and entered into an agreement to sell the site to Boston Properties, which had been selected to redevelop the property. The prospective sale was challenged for several years in a number of lawsuits brought in both state and federal court.[3] In February 1989, pursuant to the State Environmental Quality Review Act, Environmental Conservation Law § 8-0101 et seq. (SEQRA), a final environmental impact statement (the 1989 FEIS) was issued relating to a proposed project for the site. In May 1989, the New York City Board of Estimate approved the development of a project which conformed to the 1989 FEIS. Despite this approval, the property was never transferred to Boston Properties and the site was never developed.
In December 1993, the City, the Authority respondents and the Transit Authority entered into a memorandum of agreement which required the City’s consent to any subsequent sale or lease of the Coliseum site and gave the Mayor the power to review and consent to the site’s future redevelopment. In May 1996, a supplemental memorandum of agreement provided that the Authority respondents could not designate an end user of the site without prior written approval from the City. This agreement also declared that the City has a continuing interest in having any use of the site to be consistent with the City’s economic development planning and financial goals.
*362 In July 1996, the TBTA, with the consent of the City, issued a request for proposals (RFP) which called for the development of a project different from the proposed development analyzed in the 1989 FEIS. The RFP required that the new project conform to certain urban design guidelines (the design guidelines) which, among other restrictions, limited the allowable “floor area” of any project built on the site to 2.1 million zoning square feet.[4] Due to the fact that the new project differed from the earlier one analyzed in the 1989 FEIS, the TBTA, as “lead agency” under SEQRA, decided to prepare a supplemental environmental impact statement (SEIS). After issuing a draft SEIS and receiving comments from the public, the TBTA issued a final SEIS in July 1997 (the 1997 FSEIS). As an “involved agency” under SEQRA, the City participated in the environmental review leading up to the issuance of the 1997 FSEIS.
The 1997 FSEIS presented a comprehensive analysis of the environmental impacts of four different types of “worst-case” development scenarios, each with a maximum floor area of 2.1 million zoning square feet. The analysis focused on environmental impacts such as traffic and transportation, solid waste and energy, air quality and shadows cast by the proposed projects. The FSEIS also included an analysis of five project proposals that had been submitted in response to the RFP by entities interested in acquiring the site, including a proposal by respondent Columbus. In addition, as a result of the SEIS process, the Authority respondents added a further design guideline which, among other things, required that retail use of the site be limited to 975,000 gross square feet. In late July 1997, shortly after completion of the FSEIS, the Authority respondents adopted a statement of findings, as required by SEQRA (the SEQRA Findings), approving the sale of the site for redevelopment under the RFP. The SEQRA Findings made clear that any future development on the site must abide by the 2.1 million and 975,000 square footage limits set by the design guidelines.
Subsequent to the Authority respondents’ adoption of the SEQRA Findings, the 1996 RFP was amended to add a Jazz *363 Theater associated with Lincoln Center. Each of the five potential developers, including Columbus, submitted revised proposals which included, among other things, the Jazz Theater. Recognizing that SEQRA regulations would require the preparation of yet another SEIS if the revised proposals would result in significant adverse environmental impacts which were not adequately addressed in the 1989 FEIS and the 1997 FSEIS, the TBTA, as lead agency, proceeded to take a “hard look” at the environmental impacts of the new proposals. In July 1998, the TBTA concluded that the revised proposals did not reveal any unaddressed adverse environmental impacts such as would require the preparation of another SEIS. Accordingly, the Authority respondents approved a resolution reconfirming the SEQRA Findings.
The City, through the Office of the Mayor, conducted its own review of the revised proposals as well as a review of the TB-TA’s conclusion that another SEIS was not required. In a notice of findings dated July 28, 1998, and signed by Randy L. Levine, Deputy Mayor for Economic Development, Planning and Administration, the Office of the Mayor adopted written findings concerning the proposed modifications to the project. Those findings concurred with the TBTA’s position that the modifications did not change the conclusions reached in the 1997 FSEIS and would not result in significant unaddressed environmental impacts.
On July 29, 1998, Columbus was chosen as the developer of the site and executed a sales agreement with the City and the TBTA to purchase the property. The sales agreement required that Columbus execute an instrument of undertakings, waivers, covenants and restrictions (the Covenant) that would require its adherence to the square footage limitations mandated by the design guidelines and the findings of the 1997 FSEIS. The Covenant contains provisions explicitly limiting the size of the entire project to 2.1 million zoning square feet,[5] the size of commercial retail, eating and drinking and theater space to 500,000 zoning square feet and the size of the Jazz Theater to 100,000 zoning square feet. The Covenant, however, sets no limit on the overall gross square footage of the project. The City of New York is given the exclusive authority to enforce the Covenant, including the restrictions concerning the permis *364 sible square footage of the project. The Covenant specifically states that it is not enforceable by any other person or entity.[6]
In November 1998, petitioners Committee for Environmentally Sound Development, Inc. (the Committee) and John Bunch, among others, brought an article 78 proceeding against most of the same respondents here seeking to block the proposed sale. The petitioners argued that the project did not comply with the uniform land use review procedure (ULURP), that the 1997 FSEIS did not comply with SEQRA’s requirements and that the addition of the Jazz Theater required the preparation of an additional SEIS. The action was dismissed on the grounds that the project was not subject to ULURP, and that the government respondents had complied with SEQRA. The dismissal was affirmed by the Appellate Division and leave to the Court of Appeals was denied. (See Committee for Environmentally Sound Dev. v City of New York, Sup Ct, NY County, July 20, 1999, Omansky, J., index No. 120614-98, affd 268 AD2d 264 [1st Dept], lv denied 94 NY2d 763 [2000].) [7]
On July 28, 2000, a number of local elected officials wrote to E. Virgil Conway, chairperson of the MTA, expressing their concerns that, in recent weeks, Columbus had indicated to the public that the proposed project was 2.8 million square feet, a figure well in excess of the 2.1 million zoning square foot limitation mandated by the 1997 FSEIS.[8] The officials requested the MTA to delay the closing on the proposed sale of the site, which was a few days away, until it could take a “hard look,” as lead *365 agency under SEQRA, to determine whether the project’s size had increased in a way which would require additional environmental review.
On July 31, 2000, the Authority respondents conveyed all of their interest in the site to Columbus. On that same date, Columbus executed the Covenant which, as noted above, contained restrictions limiting the size of the entire project to 2.1 million zoning square feet, the size of commercial retail, eating and drinking and theater space to 500,000 zoning square feet and the size of the Jazz Theater to 100,000 zoning square feet.
On August 25, 2000, Columbus’ parent entity, Related, wrote to Councilmember Ronnie Eldridge, one of the signatories of the July 28, 2000 letter, assuring her that the project’s size was, and would remain, less than 2.1 million zoning square feet.[9] Columbus explained that, although the project’s gross square footage was over 2.8 million square feet, nearly 700,000 square feet of the project consists of below-grade space and mechanical space which, pursuant to the Zoning Resolution, is not included in the 2.1 million zoning square footage limitations.
Sometime in late January or February 2001, the Buildings Department approved Columbus’ application for a work permit to allow construction of the project.[10] The application process began on or about June 29, 2000, when Columbus first submitted the application to the Buildings Department. In the application, Columbus indicated that the size of the project would be nearly 2.8 million gross square feet. According to an affidavit from T.J. Gottesdiener, one of Columbus’ architects, on September 9, 2000, Columbus submitted various materials to the Buildings Department, including a set of zoning plans. Gottesdiener also states that on November 17, 2000, during the course of the Buildings Department’s review process, certain pages of those plans were amended. Gottesdiener does not elaborate on the nature of these amendments. Likewise, according to the first affidavit of Ronny A. Livian, former Manhattan Borough Commissioner of the Buildings Department, dated July 30, 2001, the January 17, 2001 permit approval related to a set of amended plans.
*366 Commissioner Livian’s first affidavit also indicates that an earlier set of project plans showed that the 12th and 13th floors would be used for office space, but those same plans also included zoning tabulations stating that the space would be used for mechanical purposes. Commissioner Livian’s affidavit states that on December 8, 2000, a separate set of plans was submitted to the Buildings Department correcting what he terms “this obvious error.” According to Commissioner Livian, the amended project plans were approved on January 19, 2001, and show that both floors are to be used for mechanical equipment. In a supplemental affidavit, dated August 10, 2001, Livian “clarified” his earlier affidavit and states just the opposite — that the amended plans show that the 12th floor would be used as office space, not mechanical equipment. The City respondents describe Commissioner Livian’s earlier affidavit as “unclear” or “incorrect.”
On January 23, 2001, the Buildings Department issued a temporary handwritten work permit allowing construction of the project. That permit bears an approval date of January 17, 2001 and an expiration date of March 31, 2001. According to an affidavit from Jerome S. Gillman, another of Columbus’ architects, the permit was issued “manually” because the Buildings Department was unable to issue a computer-generated permit due to problems with its computer system.
On March 28, 2001, three days before the handwritten permit was to expire, the Buildings Department issued a computer-generated work permit with an expiration date of January 26, 2004. Mr. Gillman asserts that no additional plans were submitted to obtain the computer-generated permit, though there are two differences between the permits. First, the handwritten permit reveals that the gross square footage of the project is 2,794,600 square feet, while the computer-generated permit shows that figure to be 2,568,098 square feet.[11] Second, whereas the handwritten permit indicates an approval date of January 17, 2001, the computer-generated permit bears an approval date of February 1, 2001.[12] The actual zoning plans also contain two different approval dates: January 19 and January 25, 2001.
*367 At some point during the permit review process, counsel for petitioners, James J. Periconi, filed a Freedom of Information Law request with the Buildings Department seeking to review the documents associated with Columbus’ application for the work permit. By letter dated January 4, 2001, the Buildings Department’s Record Access Officer informed Mr. Periconi that the materials sought were available for public inspection at the Buildings Department’s Manhattan Borough Office.
On January 9, 2001, Mr. Periconi wrote to Commissioner Livian alleging that Columbus’ plans to construct certain parking spaces “may” violate the Zoning Resolution. Counsel asked Mr. Livian to delay the issuance of the work permit until he and his zoning consultant could complete a review of the application materials to determine whether the proposed parking space construction violates the Zoning Resolution and whether Columbus is entitled to a work permit. Mr. Periconi did not receive a response to his letter to Mr. Livian.
At some point in late February 2001, petitioners’ consulting architect, Cornelius F. Dennis, who was undertaking a comparison between the zoning and the architectural plans submitted for the project, noticed what he terms a “significant discrepancy.” Mr. Dennis states that the zoning plans for the project’s 12th floor north tower show that 27,274 square feet (out of a total 28,880 square feet) are devoted solely to mechanical space, which, as noted earlier, is excluded from zoning square footage. However, Mr. Dennis continues, the architectural plans for that same tower show the sole use on that floor to be office space, which is not excludable from zoning square footage.
On March 27, 2001, Mr. Periconi wrote to MTA Chairperson Conway requesting that as lead agency, the MTA take a “hard look” at the project to determine whether its increased size would have potential adverse environmental impacts. This letter, which was carbon copied to the New York City Department of Law, formally demanded that the MTA comply with its legal obligations by conducting a new examination and preparing a new SEIS. By letter dated April 2, 2001, Herbert Teitelbaum, counsel for the MTA, informed Mr. Periconi that neither the MTA nor the TBTA held any interest in the Columbus Circle site. Mr. Teitelbaum suggested that all future correspondence be sent to Paul, Hastings, Janofsky & Walker, L. L. P., counsel for Columbus. On April 30, 2001, Mr. Periconi responded to Mr. Teitelbaum’s letter respectfully disagreeing with his position. Mr. Periconi restated his belief that the MTA *368 remained the lead agency under SEQRA despite its having sold the property, and reiterated his demand that the MTA conduct a further environmental review.[13] Neither the MTA nor Mr. Teitelbaum responded to this letter.
On June 13, 2001, Mr. Periconi wrote to Satish K. Babbar, Acting Commissioner of the Buildings Department, and requested that the Department halt further construction of the project pending a reconsideration of whether the March 28, 2001 work permit should have been issued.[14] Mr. Periconi alleged that the Buildings Department had approved the permit application on February 1, 2001 without permitting him to review the project’s zoning and architectural plans. In addition to restating the complaints set forth in the January 9 letter, Mr. Periconi also claimed that the project plans violate the 2.1 million zoning square footage limitation imposed by the 1997 FSEIS and the Covenant. Furthermore, Mr. Periconi informed Commissioner Babbar of the alleged discrepancy between the zoning and architectural plans for the project’s 12th floor north tower.
On June 14, 2001, petitioners filed the instant article 78 petition. In the first cause of action, petitioners claim that the Authority respondents have violated their duty under SEQRA to take a “hard look” at the project to determine if alleged changes in the project’s size require further environmental review. Alternatively, this cause of action alleges that the City has violated its SEQRA obligations by failing to ensure that Columbus abide by the project size limitations contained in the 1997 FSEIS and the Covenant. Both the Authority respondents and the City have moved to dismiss these claims for failure to state a cause of action.
In order to place this case in context, a brief description of the SEQRA process is necessary. SEQRA was enacted in 1975 in order to strike a balance between social and economic goals and concerns about the environment. (ECL 8-0103 [7]; 6 NYCRR 617.1 [d].) SEQRA makes environmental protection a concern of every governmental agency and requires that in proposing action, an agency must give consideration to protection of the environment. (ECL 8-0103 [7], [8]; 6 NYCRR 617.1 [b], [d].) Under SEQRA, an environmental impact statement (EIS) must be prepared if an agency’s action “may have a sig *369 nificant effect on the environment.” (ECL 8-0109 [2]; Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400 [1986].) The agency undertaking the proposed action and responsible for determining whether an EIS is required is known as the “lead agency.”[15] (6 NYCRR 617.2 [u]; 617.6.) If, after taking a “hard look” at the action, the lead agency determines that an EIS is required, it must prepare a draft EIS followed by a period of public hearings and/or public comment. (ECL 8-0109; H.O.M.E.S. v New York State Urban Dev. Corp., 69 AD2d 222 [4th Dept 1979].)
Unless the lead agency withdraws the proposed action or concludes that it will not have a significant effect on the environment, it must prepare a FEIS followed by written findings that the requirements of SEQRA have been met (SEQRA Findings). (6 NYCRR 617.9, 617.11.) The FEIS must contain a description of the proposed action, including its environmental impact and any unavoidable adverse environmental effects, alternatives to the proposed action, and mitigation measures proposed to minimize the environmental impact. (ECL 8-0109 [2]; 6 NYCRR 617.9 [b].) An agency may not approve an action unless it makes “an explicit finding that the requirements of [SEQRA] have been met and that consistent with social, economic and other essential considerations, to the maximum extent practicable, adverse environmental effects revealed in the environmental impact statement process will be minimized or avoided” by incorporating as conditions to the decision those mitigative measures which were identified as practicable. (ECL 8-0109 [8]; 6 NYCRR 617.11 [d] [5].) Furthermore, when changes are proposed for a project or new information is discovered, the lead agency is required to take a “hard look” at the changes or new information and must prepare an SEIS if it concludes that adverse environmental impacts not addressed in the EIS would arise. (Jackson v New York State Urban Dev. Corp., 67 NY2d 400; 6 NYCRR 617.9 [a] [7].)
In their motion to dismiss, the Authority respondents argue that SEQRA’s requirements that a lead agency take a “hard look” at project modifications only apply before an agency takes an “action,” and not after. They maintain that the last action they took with respect to the project was on July 31, 2000, *370 when they sold, the property to Columbus. Thus, the Authority respondents argue, since they have no further actions to take, SEQRA does not impose any obligation upon them to take a “hard look” at the project. They further contend that pursuant to SEQRA regulations, their lead agency responsibilities ended upon their issuance of SEQRA Findings.
Petitioners and the Authority respondents both agree that the case law and the SEQRA regulations plainly require a lead agency to prepare an SEIS if environmentally significant modifications are made to a project after the issuance of the FEIS. (Jackson v New York State Urban Dev. Corp., 67 NY2d 400; Matter of Doremus v Town of Oyster Bay, 274 AD2d 390 [2d Dept 2000]; Matter of Bryn Mawr Props. v Fries, 160 AD2d 1004 [2d Dept 1990]; Glen Head — Glenwood Landing Civic Council v Town of Oyster Bay, 88 AD2d 484 [2d Dept 1982]; 6 NYCRR 617.9 [a] [7].) The only issue in dispute is whether that requirement applies after the lead agency has issued its SEQRA Findings and taken the proposed action.
The court has found no case directly addressing this issue, nor have the parties cited a case on point. The Authority respondents argue that the cases cited by the petitioners involved the preparation of an SEIS where changes to a project occurred or new information came to light before the agency took its proposed action. While that is true, those cases do not hold that there is no requirement for preparation of an SEIS if environmentally significant events occur after the proposed action is taken. Nor have the Authority respondents cited any case that states that a lead agency has no postaction responsibilities under SEQRA. Notably, the SEQRA regulation governing the need to prepare an SEIS has no time limitations and no indication as to when the obligations of the lead agency end. (See 6 NYCRR 617.9 [a] [7].)[16] In addition, a separate regulation provides that a lead agency can be “re-established” after SEQRA Findings specifically for the purpose of preparing an SEIS. (See 6 NYCRR 617.6 [b] [6] [i] [a].) Taken together, these regulations plainly refute the Authority respondents’ sweeping contention that a lead agency has absolutely no postaction duties and no further responsibilities after it issues SEQRA Findings.
The natural extension of the Authority respondents’ position is that a lead agency can never require additional environmen *371 tal analysis after it issues findings and undertakes the action contemplated by the EIS, regardless of how a project may be changed or the nature of new information received. This court can certainly contemplate countless examples of how a project might be altered so as to require further environmental review. Further, it is impossible to predict what new environmentally significant information might be uncovered once a project gets underway. To hold that an agency can never be required to conduct further environmental review in these situations would make no sense and would ran afoul of the letter and spirit of SEQRA, which requires agencies to focus attention on environmental impacts and minimize adverse environmental effects to the maximum extent practicable. (Jackson v New York State Urban Dev. Corp., 67 NY2d 400.)
This court concludes that a lead agency’s responsibility under SEQRA to examine changes to a project does not end simply because the agency has issued its findings and has taken the proposed action, especially in a situation such as this one where construction is still ongoing. In this case, however, the court cannot place any lead agency responsibility upon the Authority respondents. On July 31, 2000, the Authority respondents sold the land upon which the project sits to Columbus, thus effectively ending their role as lead agency. In connection with the sale, they required Columbus to enter into a Covenant which limited the size of the project in accordance with the 1997 FSEIS. In that document, the Authority respondents explicitly gave the City the exclusive authority to enforce those size restrictions. Thus, after the sale, the Authority respondents lost all decision-making authority over the property and the project. To hold that they now have the duty to conduct additional environmental review more than a year after they sold the land and made provisions for enforcement of the 1997 FSEIS by other entities would be illogical. Accordingly, this court dismisses the first cause of action against the Authority respondents.[17]
Petitioners’ first cause of action also claims that the City has violated its SEQRA obligations by failing to ensure that Columbus follows the project size limitations contained in the 1997 FSEIS and the Covenant. The City argues that it has no legal obligation under SEQRA to do so because its “right” to *372 enforce the Covenant is not an “action” that falls under SEQRA.
The parties have not cited to any case law in New York or elsewhere that directly addresses this issue, and the court’s research has not uncovered any. Likewise, the SEQRA statute and regulations contain no specific information concerning agencies’ obligations and responsibilities to ensure that conditions imposed as a result of the SEQRA review process are followed. (See 1 Gerrard, Ruzow and Weinberg, Environmental Impact Review in New York § 3.14 [recognizing dearth of case law on this issue].) In the absence of any precedent or statute directly on point, this court must look to the policy and spirit of SEQRA. (See Matter of Coca-Cola Bottling Co. v Board of Estimate, 72 NY2d 674 [1988] [executive order establishing permanent lead agencies transgressed SEQRA’s spirit and violated fundamental policy of SEQRA]; Matter of Schenectady Chems. v Flacke, 83 AD2d 460, 463 [3d Dept 1981] [“an agency must comply with both the letter and the spirit of SEQRA before it will be found to have discharged its responsibility thereunder”]; 1 Gerrard, Ruzow and Weinberg, Environmental Impact Review in New York § 3.14 [“when considering events that arise after completion of the formal steps in the SEQRA process, it is important for agencies implementing SEQRA always to keep in mind the legislative purposes and mandates underlying SEQRA’s enactment”].)
In enacting SEQRA, the Legislature intended that agencies should “conduct their affairs with an awareness that they are stewards of the air, water, land, and living resources, and that they have an obligation to protect the environment for the use and enjoyment of this and all future generations.” (ECL 8-0103 [8].) Thus, the purpose of SEQRA is “to promote efforts which will prevent or eliminate damage to the environment and enhance human and community resources,” a policy meant to be implemented to the fullest extent possible. (ECL 8-0101, 8-0103 [6].) The heart of SEQRA is its requirement that agencies minimize or avoid adverse environmental effects revealed in the EIS process. (ECL 8-0109 [8]; 6 NYCRR 617.11 [d] [5].) To allow a lead agency to completely wash its hands of all responsibility over a project after the EIS process has been completed and allow the project developer to violate the restrictions contained in the EIS would be to ignore SEQRA’s requirement that economic harms be mitigated or avoided, and would render SEQRA a hollow law. It would also permit a private developer to build a project different from, and potentially more *373 harmful to the environment than, the project that went through the entire SEQRA process. The Legislature, in passing SEQRA, certainly could not have intended such a result. Accordingly, this court concludes that the only way to fully implement the policies underlying SEQRA is to hold that a lead agency has a continuing duty to ensure that conditions derived through the SEQRA process are followed by the project developer.
Having concluded that a lead agency has a continuing obligation to ensure that restrictions imposed by an EIS are followed, the only remaining issue is to determine who in this case has that duty. This court concludes that, under the facts presented here, that responsibility sits squarely on the shoulders of the City. When the Authority respondents sold the property to Columbus on July 31, 2000, they gave up any control over the project they might have had and effectively relinquished their status as lead agency. Before doing so, they required Columbus to execute a Covenant which specifically entrusted the City with the exclusive authority to enforce the limitations envisioned in the 1997 FSEIS.[18]
Thus, although not technically denominated as such, the City took on the responsibilities of a lead agency, and with it, the obligation to make certain that Columbus abides by the limitations contained in the 1997 FSEIS.[19] (See 1 Gerrard, Ruzow and Weinberg, Environmental Impact Review in New York § 3.14 [2] [“enforcement of conditions or other commitments derived through the SEQRA process is the responsibility of the agency that imposed such conditions or commitments"].) There is no question that the City remains an active participant in the project and is the only entity from the 1997 SEQRA review process that still has any involvement in this project. Furthermore, as the entity which, through its agencies, has reviewed all the construction and development plans, the City *374 certainly is in the best position to know if Columbus is not in compliance with the existing SEQRA limitations. Accordingly, the court denies the City’s motion to dismiss the first cause of action for failure to state a claim. (See Leon v Martinez, 84 NY2d 83 [1994] [in determining a motion to dismiss, the pleadings must be liberally construed to determine whether the allegations state a cause of action].)[20]
Having concluded that petitioners’ first cause of action alleges a viable claim against the City, the court must now address whether or not the claim is barred by the statute of limitations. Petitioners and respondents all agree that the applicable statute of limitations period is four months. (See CPLR 217; Matter of Save the Pine Bush v City of Albany, 70 NY2d 193, 203 [1987] [statute of limitations for SEQRA claims in article 78 proceeding is four months].) The parties are in dispute, however, as to when that period commenced. Columbus contends that the limitations period began sometime in 2000 when the various respondents, through their silence and inaction, rejected the concerns voiced in the July 28, 2000 letter written by the elected officials. The City maintains as their primary argument that the latest date upon which the statute began to run is July 31, 2000, when the Authority respondents conveyed the property to Columbus.
Respondents’ arguments ignore one of the basic premises behind petitioners’ claim, namely that the architectural and zoning plans approved by the Buildings Department in the beginning of 2001 allegedly show that the project is bigger than originally planned. Since the City has a continuing duty to ensure that the project’s size stays within the limitations envisioned in the 1997 FSEIS, the statute of limitations certainly cannot begin to run at a point before petitioners were even aware of the City’s alleged breach of its duty.[21]
As noted above, there is conflicting information as to the exact date of the Buildings Department’s approval of the project plans, and whether that approval relates to original or amended plans. This court requires additional clarification of these issues in order to resolve respondents’ claim that petitioners’ first cause of action is barred by the statute of limitations. *375 Accordingly, the court orders a factual hearing on the following issues relating to all building, zoning, construction and architectural plans (collectively plans) on file with the Buildings Department under permit No. 102686112-01: (1) when, subsequent to the Buildings Department’s January 4, 2001 letter granting Mr. Periconi’s Freedom of Information Law request, were the plans made available to petitioners, their counsel or their consultants (collectively petitioners); (2) when did petitioners review the plans, and which specific plans did they review; (3) whether any amended plans were submitted or approved after petitioners’ review; and (4) whether any amended plans were submitted or approved after the approval of the temporary work permit on January 17, 2001.[22]
Petitioners’ second cause of action alleges that the Buildings Department’s approval of the project plans and issuance of a work permit exceeds that agency’s legal authority, violates the Covenant and runs afoul of SEQRA.[23] Respondents move to dismiss this claim on the grounds that the claim does not state a cause of action, that there is a defense based on the documentary evidence, that petitioners have not exhausted administrative remedies, that the claim is barred by the statute of limitations and laches and that petitioners lack standing to enforce the Covenant.
It is well established that “one who objects to the act of an administrative agency must exhaust available administrative remedies before being permitted to litigate in * * * court.” Watergate II Apts. v Buffalo Sewer Auth., 46 NY2d 52, 57 [1978].) Thus, courts will generally not review objections to agency determinations that have not been pursued through administrative channels. (Capers v Giuliani, 253 AD2d 630 [1st Dept 1998], lv denied 93 NY2d 868 [1999].) However, this rule is inapplicable where an agency’s action is challenged as either unconstitutional or wholly beyond its power, or where *376 the only question raised is an issue of law. (Watergate II Apts. v Buffalo Sewer Auth., 46 NY2d 52; Matter of Sievers v City of New York Dept. of Bldgs., 146 AD2d 473 [1st Dept 1989].)
Under the New York City Charter, all final determinations of the Buildings Department, including the issuance of work permits, can be appealed to the Board of Standards and Appeals (BSA). (NY City Charter § 666 [6] [a].) Petitioners do not claim that they have appealed the issuance of any of the work permits in issue here. Nor do they contend that any of the exceptions noted above apply in this case. Indeed, in their reply papers, petitioners completely ignore respondents’ motion to dismiss on this ground. Because it is undisputed that petitioners have failed to exhaust administrative remedies, the second cause of action is dismissed as to all respondents. (See Matter of Weissman v City of New York, 96 AD2d 454 [1st Dept] [tenants’ challenge to Buildings Department’s issuance of work permit dismissed for failure to appeal decision to BSA], lv denied 60 NY2d 815 [1983]; Matter of Fichera v City of New York, 145 AD2d 482 [2d Dept 1988] [article 78 petition dismissed because petitioner failed to file administrative appeal challenging Buildings Department’s denial of building permit].)[24]
In the third cause of action, petitioners claim that an “imminent” change in federal regulations on carbon monoxide standards constitutes a change in circumstances requiring further SEQRA review of the project.[25] Petitioners concede that the regulations at issue have not yet been approved. Respondents move to dismiss the claim as premature. In their reply to the motions to dismiss, petitioners make no arguments to the contrary. “[C]ourts do not make mere hypothetical adjudications” and are not empowered to act “where the [dispute between the parties] is dependent upon the happening of future events.” (Prashker v United States Guar. Co., 1 NY2d 584, 592 [1956].) Since the regulations have not yet been enacted, this court concludes that the claim is not ripe for judicial review. (See New York Coalition of Recycling Enters. v City of New York, 158 Misc 2d 1 [Sup Ct, NY County 1992] [petitioner’s claim that a statute is unconstitutional “as applied” is *377 dismissed as premature since it is dependent upon regulations which had not yet been promulgated]; Matter of Ogden Citizens for Responsible Land Use v Planning Bd., 224 AD2d 921 [4th Dept 1996] [article 78 proceeding based on SEQRA dismissed as premature since granting of preliminary approval to build structure was a nonfinal step in decision-making process].) Accordingly, the third cause of action is dismissed against all respondents.[26]

. The petition also names the State of New York (the State) as a respondent. Subsequent to this action being filed, petitioners and respondents entered into a stipulation of discontinuance dismissing the State from the action without prejudice.

. Unless otherwise indicated, the court’s statement of facts is based upon undisputed assertions contained in the parties’ affidavits and exhibits, as well as a previous court decision concerning the project. (See Committee for Environmentally Sound Dev. v City of New York, index No. 120614-98, affd 268 AD2d 264 [1st Dept], lv denied 94 NY2d 763 [2000].)

. See Coalition Against Columbus Ctr. v City of New York (769 F Supp 478 [SD NY 1991], revd in part 967 F2d 764 [2d Cir 1992]); Jo & Wo Realty Corp. v City of New York (140 Misc 2d 154 [Sup Ct, NY County 1988], affd 157 AD2d 205 [1st Dept], affd 76 NY2d 962 [1990]); Matter of Municipal Art Socy. v City of New York, 137 Misc 2d 832 [Sup Ct, NY County 1987]).

. The term “floor area,” commonly referred to as “zoning squarq footage,” is defined in section 12-10 of the New York City Zoning Resolution (the Zoning Resolution). Under that definition, certain parts of a building’s “gross square footage,” such as mechanical areas and below-ground space, are excluded when calculating the building’s square footage for zoning purposes. Put simply, a building’s “gross square footage” represents the sum of the “zoning square footage” and the square footage occupied by excludable areas.

. The Covenant uses the term “floor area” as defined in the Zoning Resolution, which, as noted earlier, is synonymous with “zoning square footage.”

. The Covenant gives the Authority respondents the right to enforce certain discrete provisions, none of which relates to the project’s size limitations. These provisions include requiring the development of a cultural performance facility, construction and maintenance of a subway entrance and modification of project uses other than office, studio or residential uses.

. The Committee also brought several lawsuits in federal court relating to the project. First, in 1997, the Committee and some of its members commenced an action in the United States District Court for the Southern District of New York alleging violations of the Federal Clean Air Act and ULURP. The court dismissed the action due to the plaintiffs’ failure to comply with the Clean Air Act’s notice provisions. In 1998, the plaintiffs filed another complaint in federal court on similar grounds which also was dismissed on the pleadings. (Committee For Environmentally Sound Dev. v City of New York, 1998 WL 832606, 1998 US Dist LEXIS 18818 [SD NY, Dec. 1, 1998, Kram, J.].) Plaintiffs subsequently moved to amend the complaint, and that motion was denied. (Committee For Environmentally Sound Dev. v City of New York, 49 ERC [BNA] 1126 [SD NY, Mar. 9, 1999, Kram, J.], affd 201 F3d 430 [2d Cir 1999], cert denied 531 US 814 [2000].)

. The letter indicates that a carbon copy was sent to both the Buildings Department and Related Companies, L.P. (Related), Columbus’ parent company.

. Although petitioners state that the letter from Related was written in response to the elected officials’ July 28, 2000 letter, the letter itself indicates that it is in response to a separate letter written to Related by Councilmember Eldridge on August 9, 2000.

. As discussed infra at 365-366, there is conflicting information as to the exact date of the Buildings Department’s approval.

. None of the parties’ submissions provides any explanation for this discrepancy.

. According to Commissioner Livian’s affidavit, the plans, as amended, were actually approved on January 17, 2001. Commissioner Livian goes on to explain that the February 1, 2001 date merely indicates the date the application information was entered into the computer, and not the date of actual approval.

. A carbon copy of this letter also was sent to the New York City Department of Law.

. The letter indicates that a carbon copy was sent to the Chief of the Economic Development Division of the New York City Law Department.

. A “lead agency” is “an involved agency principally responsible for undertaking, funding or approving an action, and therefore responsible for determining whether an environmental impact statement is required in connection with the action, and for the preparation and filing of the statement if one is required.” (6 NYCRR 617.2 [u].)

. Indeed, an earlier version of this regulation limited the time an agency could require the issuance of an SEIS to a period “[p]rior to the filing of a findings statement.” (See 6 NYCRR former 617.8 [g].) In 1996, the regulation was amended to delete that temporal restriction.

. Given this disposition, the court need not reach the more difficult issue of how long a lead agency’s SEQRA responsibility to conduct an additional review continues once a project is underway. (See Matter of E.F.S. Ventures Corp. v Foster, 71 NY2d 359 [1988].)

. Despite the City’s argument to the contrary, petitioners are not seeking to enforce the Covenant. Rather, they are seeking to compel the City to ensure that Columbus follows the limitations contained in the 1997 FSEIS, which just so happen to be incorporated into the Covenant.

. It bears mentioning that this was not the first time the City undertook responsibility for environmental concerns concerning the project. As noted earlier, when the original RFP was amended to include a Jazz Theater, the City, through the Office of the Mayor, conducted its own independent review of the TBTA’s conclusion that another SEIS was not required. After conducting that review, the Deputy Mayor for Economic Development, Planning and Administration adopted written findings concerning the proposed modifications which concurred with the TBTA’s determination that the changes did not affect the conclusions reached in the 1997 FSEIS.

. This cause of action does not allege.any claim against Columbus. Nevertheless, Columbus shall remain in this proceeding as an interested or necessary party. (CPLR 1001 [a]; 7802 [d].)

. Indeed, the City alternatively suggests that January 23, 2001, the date the Buildings Department issued the temporary work permit for the project, is a possible triggering event for the limitations period.

. Columbus’ and the City respondents’ motions to dismiss the first cause of action on res judicata and collateral estoppel grounds are denied since the issues raised in this litigation concerning the building size have not been decided in any previous proceeding. Their motions to dismiss on the grounds that there is a defense founded upon documentary evidence and that the claim is barred by laches, as well as the City respondents’ motion for summary judgment on what is now the sole remaining claim, are held in abeyance until after the hearing on the statute of limitations issue.

. Although this cause of action is pleaded against all respondents, it is only the actions of the Buildings Department that are specifically challenged. To the extent that the claim is read to allege a cause of action against the Authority respondents, the court dismisses it for the same reasons it dismissed the first cause of action against them.

. Given this disposition, the court need not address respondents’ remaining grounds for dismissal of this cause of action.

. The third cause of action is pleaded against the State which, as noted earlier, is no longer a party to this proceeding. For the purposes of this motion, however, the court will assume that the allegations in this cause of action are made against all respondents.

. This cause of action, to the extent it relates to the Authority respondents, is dismissed against them for the additional reason that they no longer have any obligations under SEQRA.